**THE PRESIDENT MADISON (four cases).**
Nos. 13557, 13558, 13577, 13585.

District Court, W. D. Washington, N. D.
Nov. 5, 1935.

Kerr, McCord & Carey, of Seattle, Wash., for libelant Skagit River Navigation & Trading Co.

Harroun, Maloy & Shidler, of Seattle, Wash., for libelant Washington Tug & Barge Co., Tugs & Barges, Inc., H. F. Haines, and Petroleum Navigation Co.

Bayley & Croson, of Seattle, Wash., for libelant Northland Transp. Co.

Bogle, Bogle & Gates, of Seattle, Wash., for respondent American Mail Line, Limited.

John S. Robinson and Glenn J. Fairbrook, both of Seattle, Wash., for respondent Port of Seattle.

NETERER, District Judge.

On October 21, 1934, the President Madison was moored on the west side of Pier 41, Port of Seattle, stern offshore. The ship was laid up (out of commission) in March, 1933. In August, 1934, she was moved astern to the east side of the pier, bow offshore, 100 feet from the end of the pier. It was moored to the dock by a 1¼ six-stranded wire cable from the port bow chock to the offshore kevel on the face of the wharf 162 feet from the bow chock at an angle of 11 degrees; a 1¼ six-stranded galvanized plough steel wire from the starboard chock to the first kevel on the south end of the wharf 144 feet outside of the chock at an angle of 12 degrees; a 1¾ galvanized plough steel towing hawser leading from the third chock from the bow to the second kevel embedded in the bull rail tied to the stringer on the dock, 94 feet from chock to kevel at an angle of 19 degrees (all above lines leading forward); a 1⅛-inch six-stranded galvanized plough steel wire leading from No. 2 chock aft to kevel No. 3 on the wharf (counting from off shore) 106 feet from chock to kevel leading aft at an angle of 17 degrees; an 8-inch manila line leading from the same chock to the same kevel; a durable wire 1⅜ inches in diameter from the port quarter chock to the No. 8 kevel 110 feet from chock at an angle of 11 degrees; a 1¼-inch six-stranded plough steel wire cable from the starboard quarter chock to No. 8 kevel 95 feet from chock to kevel at an angle of 13 degrees; a 2-inch plough steel wire towing hawser from No. 2 chock from aft to kevel No. 8, 126 feet from chock to kevel at an angle of 10 degrees; a 1¼-inch six-stranded plough steel cable from chock No. 3 to kevel No. 7, 67 feet from chock to kevel, at an angle of 20 degrees; a 1¼-inch six-strand plough steel wire cable from chock No. 3 leading forward to kevel No. 6 as head spring 72 feet from chock to kevel at an angle of 19 degrees; an 8-inch manila rope from chock No. 4 leading aft as a stern spring 133 feet from chock to kevel at an incline of 10 degrees —vertical height of chocks above the kevels, 31 feet. The angles, in degrees, were computed January 15, 1935, or 86 days after the storm, by the watchman in charge of the vessel on October 21, 1934, on a basis of half flood tide at 12:40 p. m.

The toggle joints formed by the bow-spring from No. 3 chock to the second kevel 94 feet at a 19-plus degree angle and from chock No. 3 forward to kevel as head spring 67 feet from chock at 20-plus degrees, and from chock No. 3 to kevel No. 6, 72 feet from chock at an angle of 19-plus degrees, were comparatively short, and the metacentric height was at or near the center of gravity, it is stated, which appears confirmed by the disclosed physical facts, and the instability thereby created caused the force of the gale to affect the ship more radically in movement and forced to resist very much more than the wind pressure in the upward lift loosening the dock structure, and horizontal pull or shear on the pier; there being no breast line to stay the horizontal pull.

■ The vessel out of commission had a fixed status of rest for an indefinite period, its crew was withdrawn, and that required it to be moored with greater care than a vessel in commission under power with full crew, and temporary moorings for taking and releasing cargo.

The spring lines should have been reinforced by a forward breast line, with a long lead, as nearly as possible at right angles at mooring. Another breast line should have been run aft the vessel at right angles in the forenoon of the day of the gale. To run the line would have required six additional seamen. These could have been obtained within half an hour from the Seamen's Hall, and the line could have been run and fastened in ample time to avoid the drifting.

The office of the respondent American Mail Line was at the shore end of the pier, approximately 2,000 feet distant, in which was a telephone. The port engineer was in the office and came to inspect the President Madison between 10 o'clock and 11:15 a. m., he says, to see whether she was in trim, and, if listing, arrange to pump her out. He assisted the master in adjusting one after spring head and one after stern spring line.

The port engineer or the watchman could by phone have called the Seamen's Hall and immediately secured all necessary seamen.

One or both anchors likewise should have been cast. One man could have cast both anchors within two or three minutes after reaching the anchors. There was ample time, at least an hour, to cast the anchors before lifting and pulling parts of the pier by the spring lines, which caused separating of the bow lines and drifting.

■ The vessel was 535 feet long, 72 foot beam, drew 14 feet forward and 24 feet aft; tonnage, 14,187 tons; she was light. All double bottoms were full of salt and fresh water, weight 1,610 tons, and 140 tons of fuel oil were on the ship. Her stem was, at 12:40 p. m., 43 feet above water, 31.3 feet above pier. The vessel's sun deck was 26.5 feet above the main deck, and the main deck was 26.3 feet above the pier. Total height of the sun deck above the pier was 52.9 feet. At 1 o'clock p. m. she was at least four inches higher, or 53.1 feet. The break must have occurred at 1 p. m., so entered in the log of the President Madison by the master on the same day, and the collision at 1:20 p. m., all of which the master "confirmed afterwards." This is corroborated by a witness who saw the movement from separation of bow lines and drift to the collision. The master, on the trial, fixed the break at 12:40 p. m., based, he says, on subsequent conversation with others, but he may not impeach his own log, and more especially when the log entry is corroborated by a disinterested person who saw the entire incident.

The tide ranged .8 feet between high and low, and was rising from 9:54 a. m. until 3:17 p. m. She had two stockless anchors at her bow, weighing 6½ tons and 5½ tons, respectively, attached to 135 fathoms of anchor chains weighing 447 pounds per fathom, or weight in excess of 31 tons each.

The first break was at No. 2 kevel and No. 3 kevel, where the dock was lifted up and pulled out, and then two headlines separated, and the bow of the ship swung to Pier 40, followed by two stern lines separating, while the vessel was drifting shoreward between Piers 40 and 41, bow scraping Pier 40, stern bumping against and rebounding from Pier 41. When it had drifted to the end of the respective stern lines, parts of the dock pulled out.

The bottom of the slip was composed of blue clay mud and sand. Anchorage for warships allotted to and used by the Navy Department is right off Pier 41. This ground was also used for anchorage of "President" vessels of respondent Mail Line during 1934 pending longshoremen's strike. The anchorage in this slip is good. The cast anchors with 60 fathoms of chain would have stopped and held the vessel in 200 to 400 feet or less astern her mooring, her port side against Pier 40 and parallel thereto or nearly so, or stern swinging to starboard and port between Pier 40 and the center line of the slip. The vessel drifted approximately 2,000 feet in twenty minutes, one mile in approximately fifty-two minutes.

At 7 a. m. on this day the weather bureau at Seattle, established and maintained in Seattle since 1890 (forty-five years), displayed a storm signal of two red flags 8 feet square with a black center, one flag above the other, as "whole gale" warning, on the roof of the Exchange building, 349 feet above Elliott Bay. "Whole gale" means 75 miles an hour. Other like flags were displayed on flagstaffs at Seattle Yacht Club and on the shore of Lake Union, the visibility was good; the meteorologist of the weather bureau testified from 15 to 20 miles. There was no contrary evidence. The "whole gale" warning on the Exchange building was readily visible from the President Madison about two miles away. The wind velocity at the Exchange building follows, as registered by the Dines Anemograph:

| Time | | Average Hour | | Maximum for 5-Minute Period |
|---|---|---|---|---|
| 8–9 | A.M. | 19 | miles | —— |
| 9–10 | A.M. | 26 | " | 37 miles. |
| 10–11 | A.M. | 41 | " | 46 " |
| 11–12 | Noon | 43 | " | 52 " |
| 12–1 | P.M. | 50 | " | 56 " |
| 2–6 | P.M. | 63 | " | —— |

The maximum gusts in terms of velocity were:

| 8:45 | for single gust | 27 miles per hour. |
|---|---|---|
| 9:43 | " " " | 38 " " " |
| 10:45 | " " " | 55 " " " |
| 11:54 | " " " | 65 " " " |
| 12:20 | " " " | 70 " " " |
| 1:15 | " " " | 69 " " " |
| 3:14 | " " " | 69 " " " |
| 4:29 | " " " | 61 " " " |

On this day the Dines Anemograph rose 19 per cent. above the register of the 3-cup anemometer. The difference between the Dines Anemograph and the 3-cup anemometer is that the Dines Anemograph registers every single gust, and the 3-cup anemometer, which is standard throughout the world, only records each single mile on the register sheet (time sheet). The Dines was running 19 per cent. over true velocities as recorded by the cup, with an exposure almost identical. The meteorological summary for 1933 states that the highest wind velocity in Seattle in October in forty-two years immediately preceding was forty-six miles per hour.

The wind in the morning of October 21, 1934, was southeasterly hauling southward, and south to southwest, and was southwest between 10 o'clock and 11 o'clock a. m. The watchman testified that in the morning there was a "light" breeze, "moderate breeze," "fresh breeze," "strong breeze," "kept increasing." "It (was) breezing all the time." "Must have been between 40 and 50 miles per hour." A fresh breeze is 19 to 24 miles per hour. A strong breeze is 25 to 38 miles per hour.

The Aleutian Native was moored in the slip at Pier 41, 950 feet from the outward end of Pier 41, or 315 feet astern the President Madison. The Harvester was moored at Pier 41, 1,510 feet from the end of the pier, or 875 feet astern the President Madison. The North Haven was moored 1,770 feet from the end of Pier 40 across the slip from the President Madison and 1,135 feet landward from a point on Pier 40 opposite the stern of the President Madison.

Immediately south of the sea wall in the slip between Piers 40 and 41 were moored derrick barge W. T. & B. Co., No. 21, oil barges No. 10 and No. 11, the W. T. & Barge Co. No. 6, barges No. 11, No. 62, No. 66, No. 23, No. 75, No. 76, and No. 77, and tugs Roosevelt, Crosby, Bee, Hornet, Wasp, George T., L. S. Wood No. 7, and Umatilla.

In drifting inshore, the President Madison collided with the Aleutian Native, Harvester, and North Haven, submerging the Harvester, doing, it is claimed, some damage to the North Haven, the Aleutian Native, and to the tugs and barges above named.

Pier 41 was constructed of Douglas fir in 1920. The kevel rests on the bull rail (10x12 inches) which rests on blocks 4

inches thick placed on the planking supported by a longitudinal timber or stringer resting on a subcap on the main cap that is drift-bolted to the piles driven into the ground. The drift bolt is put through the kevel and timbers down into the "waling cap" or chock rail. The bolts have a head on one end and a thread on the other on which a nut is placed bearing against an iron washer, which bears against the waling cap. Anchor rods or tie rods were also run diagonally down into the main cap. This is the only dock in the port which has such drift rods. These were put in when the dock was repaired about 1929 or 1930, and for the purpose of anchoring the kevel more securely, to the structure and take the effect of the horizontal pull from the kevel to the main cap. The bull rail was in bad condition, about 50 per cent. to 70 per cent. deteriorated. The substructure or under portion of the dock to which the kevel was secured was in good condition.

■ The conclusion is inevitable that the respondent ship is at fault (a) in not being properly moored when she was laid up at Pier 41 by making toggle joints in the spring lines too short; (b) failing to extend a forward breast line when moored; (c) to extend aft breast line in the forenoon of October 21, 1934, after increasing breezes to 40 or 50 miles per hour and warning of approaching of whole gale; (d) to cast anchors before vessel broke from the dock; (e) to cast anchors after breaking away and drifting of the vessel.

The respondent Port of Seattle is a municipal corporation and owns and operates a substantial dock said to be the largest in the world. There is no condition disclosed to show that it failed to exercise reasonable precaution in not anticipating and providing against the occurrence.

■■ The port is held to a high degree of care, but it was not an insurer of the sufficiency of the dock. That the dock was sufficient, had the vessel been properly moored, is obvious from the evidence. The break occurred, I think, at 1 o'clock p. m. The dock resisted the force of gusts of wind of 55 miles per hour at 10:45 a. m.; of 65 miles per hour at 11:54; of 70 miles per hour at 12:20; and velocity of two-minute duration 3-cup anemometer 61 miles per hour at 12:33 p. m. The dock had resisted a force of 28 miles above the highest known wind. It was not until the gale, reinforced by the rising tide and the surge and instability of the vessel caused

by the low metacentric height of the ship, produced a lifting force, against which reasonable care—the port not in control of the vessel—cannot be held responsible.

The force produced primarily by the gale was resisted by the dock for forty minutes after the 70-mile gust Dines, and 27 minutes after the 61 mile for the two-minute duration 3-cup anemometer. And when the pier did break, the wind velocity was 56 miles per hour for five-minute period, or 50 miles for the hour. It was the last inch in the rise of the tide shortening the toggle joint, forcing upward the weight of the vessel against the spring lines and no breast line to relieve the spring lines of the horizontal pull occasioned by the surge and force of the gale, lifted and pulled a portion of the dock holding kevels No. 2 and No. 3, followed by the bow lines, separating, and drifting of the ship, and thereby adding to the surge and flooding tide, raised and pulled other portions of the pier, that caused the dock to break "like the last straw that broke the camel's back."

■ Notice of the approaching "whole gale" must be charged to the watchmen. The watchman going on at 8 o'clock a. m. says breezes increased to a strong breeze (40 to 50 miles per hour), and kept increasing. This must have been near 10 o'clock a. m. He must also be charged with notice of the whole gale approach from 8 o'clock a. m. when he entered watch.

■ The proximity of the telephone to the vessel, the availability of seamen, failure to properly moor the vessel when laid up, by placing forward and aft spring lines 94 and 67 and 72 feet long, respectively, to kevels 31 feet below the respective chocks at half flood tide, not aided by a forward breast line, and not having the lines on equal strain with the bow and stern lines, nor putting out aft breast line before 11 o'clock a. m., or at any time, and failure to cast anchors before or after the breakaway, will not justify a finding that the drifting and, thereby, the damages, was an inevitable accident or a vis major.

■ One of the primary purposes of the weather bureau is to aid shipping. It is the primary duty of a watchman to look, think, and act—look for apparent or threatened approaching danger, think how to avoid or meet it, and act to avoid or meet its effect. It was the duty of the watchman before leaving shift at 8 a. m. to look for weather signals; had he done so, the warning would have been seen, and communicated to the master going on duty at 8 o'clock a. m.; and it was the duty of the on-coming watchman to look, think, and act, and invoke every known agency at his immediate command to protect not only other water craft in the slip, but his ship, and also the pier at which it was moored. This view is not in retrospect. The Walter A. Luckenbach, 14 F.(2d) 100–102 (C.C.A.9). Nor is it within the rule of nautical maneuvers at sea. Ordinary care, caution, and nautical skill must be exercised in the light of known danger. Nautical skill was not exercised in mooring the ship; no eye was turned to the warning signal of the whole gale approach; and no care or caution was exercised to hold the vessel against the on-coming gale (except tightening lines aft) and the force of the approaching 75-mile per hour gale due to strike forward starboard quarter.

■ The statement herein is not an affectation of nautical skill by this court, but merely an expression of common sense, in the light and weight of the evidence before the court. Metaphysically, no concept of care apart from the conditions to be met can be given. The degree of care required is measured by the circumstances or conditions to be guarded against. Knowledge (which must be attributed) of the approach of a whole gale or contact with wind velocity of "40 or 50 miles per hour," requires a higher degree of prudence to resist its destructive force than lack of knowledge or an ordinary wind. See 45 C.J., 680–698; The Louisiana, 3 Wall.(70 U.S.) 164, 18 L.Ed. 85. Nor is the watchman alone culpable. His superior approved the mooring. At 10 a. m. on the 21st, he said, at 10 a. m. the wind was blowing quite hard "and continued to increase," but did nothing to assist the watchman or secure the ship.

■ As I view it, there can be no dispute as to the applicable principles of the law. A number of splendid nautical men of long experience of like tonnage vessels, some interested now as owners and operators of shipping lines, others employed as masters of ships, state the vessel was properly moored and breast lines and casting anchors were not required by reasonable and prudent seamanship. There are others of equal experience who say just the reverse.

Mariners may not establish in such case a rule of conduct which will excuse them from exercising every effort in their immediate power and control, using due care and caution and display of nautical skill to avoid or prevent injury by such an event. This, it is obvious, was not done.

The respondents, ship and owner, have not overcome the presumption of fault. Interlocutory decree for libelants and intervening libelants. The cause will be continued for stipulation of facts or proof establishing the damages.

This memorandum may be considered the court's findings and conclusions; or further proposed findings may, on notice, be presented.