## THE REBECCA.

## THE CHARLES H. SHAW.

### No. 5405.

Circuit Court of Appeals, Fourth Circuit.
Nov. 6, 1945.

Rehearing Denied Dec. 28, 1945.

C. Parker Breese, Jr., and R. Arthur Jett, both of Norfolk, Va., for appellant.

Leon T. Seawell and John W. Oast, Jr., both of Norfolk, Va., for appellees.

Before SOPER and NORTHCOTT, Circuit Judges, and HARRY E. WATKINS, District Judge.

NORTHCOTT, Circuit Judge.

This is a libel filed in October, 1943, in the District Court of the United States for the Eastern District of Virginia, at Norfolk, by the appellant, C. C. Carpenter, trading as Carpenter Construction Company, against the appellees, Motor Tug "Rebecca" and the Barge "Charles H. Shaw", seeking to recover damages allegedly caused by a collision between the barge "Shaw" and a piledriver owned by the libellant, Carpenter Construction Company. A hearing was had in October, 1944, at which evidence was taken. At the conclusion of the hearing the judge made findings of fact and stated his conclusions of law and dismissed the libel. From this action of the court below this appeal was brought.

The appellant is a resident of Norfolk, Virginia, and is engaged in the general work of construction and repair and owned and operated a floating piledriver, a vessel 55 feet long, 27 feet beam and 5½ feet deep.

The motor tug "Rebecca" is a vessel 64 feet 10 inches long, 14 feet 6 inches beam, and is owned by the Coppersmith Towing Company, a North Carolina corporation, with its principal office at Elizabeth City, North Carolina.

The barge "Charles H. Shaw" is a vessel weighing approximately 600 tons, 156 feet long, 34.5 feet beam, 16 feet deep and is owned by E. L. Shaw, of Philadelphia, Pennsylvania. At the time of the collision here in question the barge had a crew and captain and was being towed south by the tug "Rebecca".

On the afternoon of April 7, 1943, the piledriver was being used by the libellant pursuant to a contract with the United States of America, in connection with repairs to the fender system of the Government drawbridge across the Inland Waterway Canal at Great Bridge, Norfolk County, Virginia.

The tug "Rebecca" towing the barge "Shaw" was on its way from Norfolk Harbor to Plymouth, North Carolina, via the Inland Waterway Canal. Upon approaching the bridge the tug gave a signal indicating that the tug and tow desired to pass through the Great Bridge draw. At this time the piledriver was working in the channel at the draw. While waiting for a reply to the signal of the tug, the hawser, by which the barge was being towed, went slack and was shortened to about fifty feet. In response to the tug's signal the piledriver was removed by its crew to the northward side of the canal and close to the fender system near the center and made fast, the piledriver remaining within the draw. Thereupon, an answering signal was given from the bridge for the tug and tow to proceed. The width of the channel between the fenders of said drawbridge is 80 feet and the length of the straightaway is 200 feet. The space left for navigation between the south side of the piledriver and the opposite fender system was approximately 53 feet. The tug and barge proceeded through the draw at a speed of about two miles per hour. The barge did not follow straight behind the tug but sheered first to its starboard making contact with the southerly side of the fender system, after which it sheered to port coming in contact with the piledriver, rubbing or scraping the side thereof, the tug having passed through the opening safely.

The captain of the tug had an unobstructed view of the movements of the piledriver and the space left for the navigation of his vessel and tow and proceeded through the draw without signaling for any clearer channel and without making any objection to the manner in which the piledriver was placed in the channel.

Immediately after the barge had passed those on the pile driver removed one of its hatches and an examination of the hold disclosed a small leak or trickle of water down the timbers of the hull at or near the point of impact with the barge. No broken timbers were observed nor was any other evidence of damage discovered.

Those in charge of the tug and barge had no knowledge of any damage to the piledriver and no information was given to them that any damage was caused the piledriver and no claim respecting such damage was made until long after the sinking of the piledriver, which occurred on the following morning.

Following the incident of the contact, which occurred at about 3:30 P. M., the piledriver continued in operation until quitting time at about 4:30, when it was moved out of the draw into shallow water on the southerly side of the canal, and moored for the night. Another examination of the hold was then made but no noticeable increase in seepage was discovered.

The piledriver was equipped with four two-inch syphons and a boiler operated by steam, but no hand pump. After being tied up for the night a watchman, familiar with the operation of the syphons, was placed on board the piledriver, by libellant's foreman in charge, and cautioned to keep a lookout for any increase in the leakage, and in the event that any more leakage developed to get the syphons going and if he needed help to notify officers in charge of the piledriver. It seems clear from the evidence that the fire under the boiler was banked.

Before day on the next morning the watchman· notified by telephone one of the libellant's foremen that the piledriver was sinking, whereupon said foreman proceeded to the place where the piledriver was moored with additional pumps, but, upon arriving found that the piledriver had sunk. It was subsequently raised by libellant and repaired.

Weather conditions throughout the night of April 7, 1943, and until the piledriver later sank, were good, and there was no evidence introduced concerning any other

occurrences in connection with the piledriver in the meantime. The watchman on the piledriver was not introduced as a witness it being stated by the foreman of the piledriver that he had left the employ of the libellant and there was no evidence offered as to what occurred during the night or just when the leakage increased to such an extent that the piledriver sank.

In his conclusion of law the judge below held that the tug "Rebecca" and the barge "Shaw" were not responsible for the sinking of the piledriver and that the libellant had failed to show any causal connection between the slight contact between the barge and the piledriver and the sinking of the piledriver. In his memorandum opinion the trial judge held that the contact between the barge and the piledriver was caused by the fault of both the tug and the barge.

Two questions are to be considered. First, who was responsible for the contact between the barge and the piledriver; second, what damage if any was caused by the contact?

█ The captain of the tug "Rebecca" knew the situation when he entered the draw; he saw how much space he had in the channel between the piledriver and the fender system on the opposite side of the channel through which to take his tug and tow; he must have known how his tow handled and if there was any responsibility for what happened in the draw it was the responsibility of the master of the tug.

"In the absence of an agreement to the contrary, a tug which supplies the motive power to her tow is the dominant mind, and the tow is required to follow directions from the tug." The Fort George, 2 Cir., 183 F. 731.

There are no conflicting decisions on this point and this in reason must be the law. There can be no divided authority and somebody must be in command, and, it must be the captain of the tug.

█ Here there was no fault properly attributable to the barge and the responsibility for the happening in the draw was the fault of the tug. The judge below was clearly in error in finding that the barge "Shaw" was in any way responsible for the contact. The captain of the barge was at the wheel endeavoring to steer it and he testified that he did not have enough speed to properly steer the barge and make it respond to its helm; this again was clearly the fault of the tug.

█ There was no fault on the part of the piledriver, as to the collision, its crew did what it had usually and repeatedly done to permit the passage of tugs towing barges of as much or more beam than had the barge "Shaw" and no collision had resulted from the frequent passage of these barges. The piledriver was apparently seaworthy, having been overhauled about three months before. Had the master of the tug signalled for more space the piledriver could have been removed entirely from the channel. The captain of the tug accepted the situation and attempted the passage. The resulting contact between the barge and the piledriver was clearly the fault of the tug and whatever damages if any were caused must be laid at the door of the tug. See, The S. & P. No. 15, D.C., 61 F.Supp. 846.

█ It is contended on behalf of the appellees that the appellant was negligent in leaving the piledriver in the draw, and attention is drawn to the provision of the construction contract in the performance of which the piledriver was engaged, that the contractor should conduct his work so as to permit the free and safe passage of traffic, and also to the regulation of the War Department, paragraph 5 clause (b), which provides in substance that no vessel shall anchor in any narrow part of the waterway except in case of emergency, and that whenever it becomes necessary for a vessel to stop in any such portion of the waterway, it shall be securely fastened to the bank as close as possible, and at such place and under such conditions as will not obstruct or prevent the passage of another vessel. It is contended that the piledriver was anchored within the passage way in this case, in violation of this rule, and that it has failed to show, in accordance with the rule in The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148, that the fault of the piledriver in this respect could not have been the cause of the collision. We think there is no merit in this contention since it was essential that the piledriver operate within the passage way, and since it was moored in such a position after the signals were exchanged as not to obstruct or prevent the passage of other vessels. The arrangement by which the piledriver was moored so as to be parallel with the passage way was customarily made for the passage of vessels through the fender

610

system, and was accepted without protest by the tug and without request that the piledriver be entirely removed from the channel. There was in our opinion no violation of the regulation in this case.

The evidence shows that the contact was very slight, amounting to little more than a grazing or rubbing of the side of the barge against the side of the piledriver. An examination made by the crew of the piledriver, immediately after the happening, showed no apparent damage and the piledriver continued its work until quitting time. After the piledriver was removed to the side of the canal, out of the draw and moored in shallow water, another examination was made and no discernible damage could be found.

 Notwithstanding the fact that the crew of the piledriver were blameless as to the contact with the barge, knowing that the contact had occurred it became the duty of those in charge to take proper care to see that whatever damage was done by the contact should not be allowed to sink the piledriver. The appellant's foreman testified that he gave proper instructions to the night watchman as to watching for any increase in the leak and pumping out the hull in case the leak did increase. Whether this was done by the watchman is not disclosed in the evidence as he was not offered as a witness, he had left the employ of the appellant and could not be found. Any failure on the part of the appellant to look after the piledriver during the night following the collision would amount to such contributory negligence as to make any damage that resulted from the sinking his sole liability.

We therefore conclude that the tug "Rebecca" should be held liable for the damages, if any, that immediately resulted from the contact between the barge "Shaw" and the piledriver; that it is apparent that this damage was slight and should not be augmented by any further damage resulting from the negligence in the care of the piledriver during the night following the incident. The decision of the Judge below is accordingly reversed as to the tug "Rebecca" and affirmed as to the barge "Shaw" and the cause is remanded to the court below for the ascertainment of the amount of damage immediately resulting from the contact of the barge and the piledriver, such damage to be assessed against the tug "Rebecca".

Affirmed in part and reversed in part.

On Rehearing.

PER CURIAM.

Appellant's petition for rehearing is founded upon the premise that our opinion, filed November 6, 1945, holds that, (1) there was negligence in the care of the piledriver following the collision, sufficient to charge its owner for its sinking; and (2) the tug, Rebecca, should be held liable only for damages resulting from the immediate contact between the barge and piledriver, and not for any damages to the piledriver resulting from the sinking.

In both respects appellant has incorrectly interpreted the intent of our opinion. We did not decide these questions. We merely returned the case to the trial court for further evidence and specific findings of fact as to the extent and effect of negligence, if any, on the part of those in charge of the piledriver following the collision. These questions, as well as that concerning the burden of proof as to such alleged negligence in the care of the piledriver, remain open for specific findings of fact and conclusions of law by the trial court upon remand of the case.

The petition for rehearing is denied.

Rehearing denied.