Malcolm B. TEBBS, Libelant,

v.

The BAKER–WHITELEY TOWING CO., Michael R. Cataneo, trading as Tony Cataneo Line Service, American Ship Service Co., Inc. and United States of America.

Malcolm B. TEBBS

v.

PACIFIC SHIPPING CORPORATION.

UNITED STATES of America

v.

M/V SANDS POINT, her engines, etc.

Adm. Nos. 4543, 4535, 4448.

United States District Court
D. Maryland.

July 6, 1967.

See also D.C., 227 F.Supp. 656.

Sol C. Berenholtz, Baltimore, Md. (Solomon Kaplan and Murray I. Resnick, Baltimore, Md., advocates), for Tebbs.

Constable, Alexander & Daneker, Baltimore, Md. (John D. Alexander, Baltimore, Md., advocate), and Foley & Martin, New York City (Christopher E. Heckman, New York City, advocate), for Baker-Whiteley Towing Co.

Richard A. Reid, of Towson, Maryland, for Michael R. Cataneo.

Lord, Whip, Coughlan & Green, Baltimore, Md. (Alva P. Weaver, III, Baltimore, Md., advocate), for American Ship Service Co., Inc.

Anthony W. Gross, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., and Thomas J. Kenney, U. S. Atty., and John H. Skeen, Jr., Baltimore, Md., for the United States.

THOMSEN, Chief Judge.

The claims and cross-claims now before the Court in these consolidated suits

in admiralty (see Section C of this opinion) arise out of a collision in Baltimore Harbor, at the foot of Broadway, on April 18, 1963, between the M/V Sands Point, an ocean-going tanker, and the yacht Abogado.[1]

Libelant Tebbs is the owner of the Abogado. Respondents and cross-claimants are: the M/V Sands Point; Pacific Shipping Corp., her owner and operator before she was seized by the United States Marshal for this district nearly four months before the collision; the United States; Baker-Whiteley Towing Co.; American Ship Service Co.; and Michael Cataneo, t/a Tony Cataneo Line Service.

There is hopeless conflict between the testimony of the many witnesses; and because of the passage of time since the collision and for other reasons, much of the testimony was not reliable.

## A. *Historical Facts*

1. On December 21, 1962, the United States filed a libel in this Court against the Sands Point for oil pollution. The vessel was seized and attached by the Marshal on December 26, and on the following day was shifted by her crew to the yard of General Ship Repair Corporation, Key Highway, Baltimore, where she remained until April 17, 1963.

2. On January 9, 1963, General Ship Repair filed a libel against the vessel, and she was again seized and attached by the Marshal. The owner employed the crew aboard the vessel until January 8; thereafter the Marshal employed the crew until January 15, when on advice of the Coast Guard, he obtained approval of the Court to employ a manning crew, and reduced the crew to three mates, three engineers and three firemen—who kept steam up to avoid damage to the vessel during the winter months, and guarded against fires and vandalism.[2] One of the mates so employed was John M. Diakakis, the former chief mate of the vessel.

3. While at the General Ship Repair pier the lines used had been the vessel's lines, and they had been handled by or under the direction of the mate on duty at the time.

4. On April 16, the boilers were shut down; thereafter on advice of the Coast Guard that only a watchman was needed, the Marshal employed two men aboard the vessel. One of them, Diakakis, worked two eight-hour shifts; the other, Billy Watson, the former radio operator, worked one shift. Although both men were employed as watchmen, the Marshal chose Diakakis because of his experience and knowledge of the vessel,

**1. *VESSEL DATA:***

| NAME: | SANDS POINT | ABOGADO |
|---|---|---|
| OFFICIAL: | 249109 | 224365 |
| SERVICE: | Tanker | Pleasure Yacht |
| GROSS TONS: | 10,172 | 23 |
| NET TONS: | 6,118 | Unknown |
| LENGTH: | 488.3 Feet | 78.3 Feet |
| BREADTH: | 66.3 Feet | 15 Feet |
| DEPTH: | 39.6 Feet | Unknown |
| PROPULSION: | Steam | Diesel |
| HORSEPOWER: | 4,800 | 200 |
| HOME PORT: | New York, New York | Baltimore, Maryland |
| OWNER-OPERATOR: | Pacific Shipping Corp. | Malcolm B. Tebbs |

---

2. Port risk insurance had been taken out by the mortgagee of the vessel; it was later endorsed to provide liability and other coverage for the Marshal and the United States, as well as for the owner, the manager and the mortgagee.

and paid him $30 per shift, or $60 per day.[3]

5. On April 15, 1963, on petition of General Ship Repair, alleging that it needed to use the dock at which the Sands Point was moored, and on advice from the Marshal that the Coast Guard had arranged for a new berth to which the vessel might be shifted, the Court ordered the Marshal to remove the Sands Point from the General Ship Repair yard within 48 hours.[4]

6. The Marshal had had no experience shifting vessels, so he sought advice from respondent Cataneo. Acting on Cataneo's advice, and after obtaining two bids, the Marshal made an oral contract with Baker-Whiteley Towing Company, another respondent, to shift the Sands Point from the General Ship Repair yard to the Broadway Pier, at Broadway and Thames Street. The Marshal engaged American Ship Service, also a respondent, to furnish the linemen needed to handle the lines aboard the vessel, and Cataneo to furnish the linemen needed to handle the lines on the dock. The Marshal told Baker-Whiteley and the line companies that the Sands Point was a dead ship, with no master or riding crew aboard, only a watchman.

7. Captain George C. Hinkleman, one of Baker-Whiteley's tug captains, was in charge of shifting the vessel on the morning of April 17. He boarded the Sands Point and acted as docking master. He found Diakakis aboard the vessel, dressed and acting as a mate. The Marshal had not authorized Diakakis to continue acting as a mate, but had not forbidden him to do so. Captain Hinkleman gave orders with respect to the lines to Diakakis, who passed them on to the linemen furnished by American Ship Service. That company had furnished no foreman or gang leader, since only eight linemen were needed and it is not customary in the port of Baltimore to send a foreman unless twelve linemen are furnished.

Captain Hinkleman gave orders to the linemen on the docket, who had been furnished by Cataneo.

8. Around noon on April 17 the Sands Point was docked bow-in, with her port side to the Broadway Pier and her bow not more than 30 feet from the port side of the yacht Abogado, which was moored parallel to Thames Street along a wall.

9. The Broadway Pier has a total length of about 500 feet. The length of the Sands Point is 488.3 feet; as she was moored, her after end extended well beyond the end of the pier.

10. Captain Hinkleman directed that five lines be put out—two bow lines, a forward spring line, and two stern lines. Since the after end of the Sands Point extended so far beyond the end of the pier, the stern lines did not run aft from the vessel to the pier, and so were not effective to prevent the vessel from moving forward, as they would normally have been. The responsibility for preventing forward movement of the vessel therefore rested on the one forward spring line when Captain Hinkleman left the Sands Point. Captain Hinkleman gave no heed to the condition of the lines although he noticed that they were old and worn.

11. A westerly wind was blowing against the port side of the vessel. The lines which Captain Hinkleman had ordered put out were insufficient, and Diakakis prudently caused additional lines to be put out. The evidence varies as to how many; the Court finds that Diakakis put out an additional forward spring line, an after spring line, and an additional bow line.

12. On the afternoon of April 17, the Director of Port Operations learned that the Sands Point was not gas-free; he objected to her location at the Broadway Pier, and the Coast Guard and the Marshal agreed that she should be shifted the next day to an anchorage out in the

---

3. While employed from January 16 to April 16 as a mate, working an eight-hour shift with an engineer and a fireman, Diakakis had been paid $40 per day.

4. On the same day, on petition of an intervening libelant, the Court ordered that the Sands Point be sold on May 9, 1963.

river. Accordingly, the Marshal called Baker-Whiteley and contracted with that company to perform the operation. The Marshal again called on American Ship Service and Cataneo to supply the linemen, and Baker-Whiteley agreed to fix the time when the linemen should report.

13. The Baker-Whiteley office assigned three tugs to participate in the operation: the Holland, 1800 H.P.; the Progress, 750 H.P.; and the Resolute, 1800 H.P. Captain Eminizer of the Holland was designated to serve as the docking and undocking master, and to be in charge of the operation. The Holland and the Progress were at the Recreation Pier (where Baker-Whiteley has an office) about 200 feet from the Broadway Pier. The two tugs moved into the slip about 2:10 p. m. The Resolute was out in the river and did not arrive until after the collision.

14. The linemen had arrived about an hour or so before the two tugs. The Cataneo men sat in their automobile until after the collision. Some of the men from American Ship came aboard the Sands Point and some remained on the dock. On instructions from Diakakis (it is immaterial whether the suggestion came from Diakakis or from the linemen), they began to single up; they took in the second forward spring line, which Diakakis had put out the day before, after Captain Hinkleman had left, and also took in one of the bow lines.[5] That work was completed before the two tugs approached the Sands Point.

15. On April 17 Diakakis undertook to act as a mate would act, transmitting orders from Captain Hinkleman to the linemen. He signed the Baker-Whiteley chit on April 17 as mate. He continued to act as a mate would act on April 18 when two Deputy Marshals were aboard, and thereafter submitted work records to the Marshal on which he was designated as mate. The Marshal never objected to such designation or conduct.

16. The weather was clear, with good visibility. The wind was more or less from the west at nearly 20 knots. Tidal current was negligible.

17. As the tug Holland entered the slip, Captain Eminizer saw that the two stern lines did not run aft from the Sands Point, and knew or should have known that they would not help prevent any forward movement of the Sands Point until she had gone forward an appreciable distance. He also knew or should have known that the Abogado was then less than 30 feet from the bow of the Sands Point.[6] He knew or should have known that the Sands Point was in the custody of the Marshal, that there was no master or riding crew aboard except Diakakis,[7] and that linemen were being supplied by American Ship Service and Cataneo, as they had been on April 17.

18. Nevertheless Captain Eminizer made no effort to determine the number or condition of the lines which were out. Nor did he take any precautions to prevent the possible forward movement of the Sands Point when the tug Holland made up to her starboard quarter in a manner which was bound to press the Sands Point forward, putting considerable strain on any lines which were in a position to prevent such forward movement. He testified that he would expect to find six lines out—two bow lines, an after spring line, a forward spring line, and two stern lines. The first three would not prevent the Sands Point from going forward 30 feet and, as noted above, the two stern lines did not serve

---

5. There was some evidence that Diakakis had also put out the night before an additional stern line or breast line; if he did, it too was taken in before the tugs arrived.

6. The several witnesses placed the bow of the Sands Point from 10 to 25 feet from the Abogado on April 18.

7. Two deputy marshals were also aboard, with instructions to pick up some records from the Mt. Evans, another ship in the custody of the Marshal, next to which the Sands Point was to be anchored. The deputy marshals had not assumed any responsibility in connection with the shifting of the vessel from the Broadway Pier to the anchorage.

that purpose as they would ordinarily have done. Captain Eminizer's own testimony, as well as other evidence, shows that the condition of the forward spring line was bad, and he could have learned that it was bad by observation before the collision or by inquiry. He did not inquire of Diakakis or anyone else about the number and condition of the lines, and Diakakis did not volunteer any such information when the tugs came alongside the Sands Point. Captain Eminizer allowed the mate of the Holland and the Captain of the Progress to make up to the Sands Point at the same time, without waiting for the Resolute, which might have been used to prevent the forward movement. Even the Progress might have prevented the Sands Point from colliding with the Abogado, if she had been fully made up at the starboard bow before the Holland exerted the forward pressure.

19. Instead of taking any of these precautions, Captain Eminizer postponed going aboard the Sands Point and retired to a room behind the wheel house of the Holland, where he made out one or more bills.

20. The mate of the Holland caused a spring line to be placed leading from a forward point on his tug aft to a point on the starboard quarter of Sands Point and then, using the tug's engines forward pivoted the stern of his tug against the starboard side of Sands Point, thereby exerting a forward pressure against the Sands Point. This caused the forward spring line between the Sands Point and the pier to part and the Sands Point to move forward and slice into the port side of the Abogado.

21. Thereafter, Captain Eminizer went aboard the Sands Point, the Resolute arrived, and the three tugs shifted the Sands Point to the anchorage.

22. The evidence shows that it is the general though not universal custom in the port of Baltimore for the tug captain who is to serve as docking master not to go upon the vessel to be towed until his tug has made up to the vessel. The evidence is not satisfactory as to what the custom is when the tow is a dead ship with no crew aboard.

### B. Evidence Ruling

Baker-Whiteley objected to the proffered testimony of Warrant Officer Schmidt of the Coast Guard (a) with respect to the customary functions of a docking master, in relation to other personnel, and (b) with respect to the physical problems involved in the maneuver. The Court sustained the objection as to (a), and reserved ruling as to (b), taking that testimony subject to exception. The Court concludes that it should overrule the objection with respect to so much of Schmidt's testimony as dealt with the forces which were or would have been exerted by the tug in the several possible and practicable means of doing the work, and what could have been done by the Progress in an effort to avoid the collision if the Progress had made up before the Holland. There was little if any dispute about those items at the trial. The Court concludes that it should sustain the objection to the testimony of Schmidt as to the customary and proper method of handling such a maneuver, and that testimony is hereby stricken from the record. See Julius Kayser & Co. v. Textron, Incorporated, 228 F.2d 783 (4 Cir., 1956), Smeragulio v. United States, 205 F.Supp. 486 (E.D.N.Y., 1962).

Counsel and Court appear to be in agreement that a party is not relieved from a charge of negligence merely because he has done what is customarily done, if what is customarily done amounts to a failure to exercise reasonable care under the circumstances of the particular case. Of course, compliance with custom, properly proved, is evidence of due care, but is not conclusive. Bryant v. Partenreederei-Ernest Russ, 330 F.2d 185 (4 Cir., 1964).

### C. Proceedings

On May 7, 1963, an intervening libel was filed by Tebbs in the original case in this Court against the Sands Point filed by the United States (No. 4448).

The Tebbs libel claimed, in the alternative, either a maritime lien against the Sands Point because of the negligence of the United States Marshal and/or the owners and operators of the Sands Point in causing the collision, or that the claim of the intervening libelant should be allowed as an expense of the United States Marshal in connection with his maintenance and preservation of the vessel after it was seized.

On May 14, 1963, Tebbs filed a libel in personam (No. 4535) against Pacific Shipping Corporation, owner of the Sands Point, claiming damages as a result of its alleged negligent failure to maintain the lines of the Sands Point in a safe and seaworthy condition. By a stipulation filed in this case, Pacific Shipping is deemed to have asserted cross-claims against Baker-Whiteley, Cataneo, and American Ship Service based upon the same grounds asserted in the cross-claims filed on behalf of the United States, referred to below.

On June 6, 1963, Tebbs filed a libel in personam (No. 4543) against Baker-Whiteley, Cataneo, American Ship Service, Marshal Udoff, American Casualty Company, his surety, and the United States for the damage sustained by the Yacht Abogado.

On May 14, 1963, the Sands Point was sold. On September 11, 1963, Baker-Whiteley filed a petition praying that the funds in the Registry of the Court resulting from the sale of the Sands Point be impounded, for the alleged reason that if Baker-Whiteley is found liable in the suit that had been filed against it, and others, it would have had a claim against those funds for contribution or indemnity, which claim it contended was either a preferred maritime lien or an expense of administration.

The libel filed by Tebbs against the United States, the Marshal, the Surety on his bond and others, alleged inter alia a maritime tort, cognizable in admiralty, by an officer of the United States acting in the course of his duties. Since a remedy for such a tort is provided by Sec. 2 of the Suits in Admiralty Act, as amended, 46 U.S.C.A. § 742, this Court held, in an opinion filed herein on March 25, 1964, sub nom. Tebbs v. Baker-Whiteley Towing Co., et al., 227 F.Supp. 656, that the Federal Tort Claims Act does not apply. And since the Suits in Admiralty Act provides "[t]hat where a remedy is provided by this chapter it shall hereafter be exclusive of any other action by reason of the same subject matter against the agent or employee of the United States or of any incorporated or unincorporated agency thereof whose act or omission gave rise to the claim", 46 U.S.C.A. § 745, this Court held that the action could not be prosecuted against the Marshal or his surety, sustained exceptions which they had filed, and dismissed the libel as against them. 227 F.Supp. at 658.

On April 8, 1964, the United States filed a cross-libel against Baker-Whiteley, Cataneo and American Ship Service, claiming attorneys' fees, costs, expenses and disbursements, plus the payment of any decree which may be rendered against the United States, based upon the contention "that the said Respondents failed to perform the agreed on services for the U. S. Marshal in a proper, skillful, expert, professional, careful and workmanlike manner."

The cases have been consolidated, various amendments and answers have been filed, and it has been agreed that the Court should hear and determine together at this time all questions of liability, indemnity or implied indemnity, but that any questions of damages and priority of maritime liens shall be heard and determined later.

D. *Findings and Conclusions with Respect to Negligence*

■ No warranty of seaworthiness of the Sands Point extended to the Abogado or her owner, and Tebbs does not claim the benefit of any such warranty. Liability must rest upon negligence. Noel v. Isbrandtsen Company, 287 F.2d 783 (4 Cir., 1961).

■ Tebbs invokes the well-established principle that when a vessel moored

to a dock is struck by a moving vessel, there is a presumption that those in charge of the moving vessel were negligent; " * * * the vessel must be held responsible for the damage resulting from the collision 'unless she can show affirmatively that the drifting was the result of inevitable accident or a vis major, which human skill and precaution and a proper display of nautical skill could not have prevented.' The Louisiana, 3 Wall. 164, 18 L.Ed. 85; The Newa, 4 Cir., 267 F. 115." Patapsco Scrap Corp. v. Maryland Shipbuild. & Dry Co., 268 F.2d 817, 819 (4 Cir., 1959), relying on United States v. South Carolina State Highway Dept., 171 F.2d 893, 896 (4 Cir., 1948). See also Wilmington Ry. Bridge Co. v. Franco-Ottoman & Co., 259 F. 166 (4 Cir., 1919).

Where a tug and tow are involved in the damage to a stationary vessel or other object, cases in the Third Circuit have held that the presumption may apply to both the tug and the tow. The Chickie, 141 F.2d 80 (3 Cir., 1944); Patterson Oil Terminals v. The Port Covington, 109 F.Supp. 953 (E.D.Pa., 1952); Patterson Terminals v. S.S. Johannes Frans, 209 F.Supp. 705 (E. D.Pa., 1962). The Second Circuit is not so sure. City of New York v. McAllister Brothers, 299 F.2d 227 (2 Cir., 1962). See also Farrell Lines, Inc. v. Birkenstein, 207 F.Supp. 500, 505 (S.D.N.Y., 1962). In The Severance, 152 F.2d 916 (4 Cir., 1945), the Fourth Circuit applied the presumption against a tug captain, who was aboard the towed vessel and in complete control thereof. See also The Gypsum Queen v. The Tug Peerless, 1953 A.M.C. 2071 (E.D.Va., Bryan, D. J., 1953). In this case the presumption might extend both to the tug Holland and to the Sands Point, but for reasons stated below it is not necessary to base the decision in this case on any such presumption.

In City of New York v. McAllister Brothers, supra, Judge Friendly, speaking for the Court, said: " * * * we agree there is no universal principle that whenever the tow is liable, the tug also is. However, there likewise can be no universal principle that if the tow is liable, the tug is not. The question is always whether the vessel sought to be charged was negligent." 299 F.2d at 228.

The basic principles controlling the instant suit were set out in the leading case of Sturgis v. Boyer, 65 U.S. (24 Howard) 110, 16 L.Ed. 591 (1860). In that case both the tug and tow were under command of the master of the tug, who gave all the orders. None of the ship's crew were on board except the mate, who did not interfere with the management of the vessel, the persons on board being all under the command of a head stevedore. The Court held the tug solely responsible for the whole loss, stating:

" * * * Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision; as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Other cases may well be imagined when the tow alone would be responsible; as when the tug is employed by the master or owners of the tow as the mere motive power to propel their vessels from one point to another, and both vessels are exclusively under the control, direction, and management, of the master and crew of the tow. * * * But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessels must, under such circumstances, look

to the tug, her master or owners, for the recompense which they are entitled to claim for any injuries that vessels or cargo may receive by such means. * * *" 65 U.S. at 121, 122.

See also The Eugene F. Moran, 212 U. S. 466, 29 S.Ct. 339, 53 L.Ed. 600 (1909), and the cases cited and discussed in Griffin on Collision, sections 176, 178, 181 and 182.

In The Rebecca, 152 F.2d 607, 609 (4 Cir., 1945), the Court quoted from The Fort George, 183 F. 731, 732 (2 Cir., 1910), as follows:

"We understand the rule to be, in the absence of an agreement to the contrary, that when the tug supplies the motive power she becomes the dominant mind, and the tow is required to follow directions from the tug."

■ In this case the Baker-Whiteley tugs supplied the motive power, and Baker-Whiteley was in charge of the shifting operation on April 18, as it had been in charge of the shifting operation on April 17. The witnesses, including Captain Eminizer, referred to the Sands Point as a "dead" ship.[8] The Sands Point was in the custody of the Marshal of this Court, her engines had been shut down, her crew had been discharged, and only a watchman, a former mate, was aboard. These facts were all known not only to the Marshal, but also to Baker-Whiteley, to American Ship Service and to Cataneo, when those three companies sent their employees to perform the services they had respectively undertaken to perform on April 18 in connection with the movement of the vessel from the Broadway Pier to the anchorage.

■ Baker-Whiteley designated Captain Eminizer of the tug Holland as the docking master on April 18. From the time the Holland and the Progress came into the slip and started to make up to the Sands Point, Captain Eminizer was in charge of the operation and owed a duty to exercise due care not to damage other vessels moored in the slip.

■ For reasons stated in the findings of Historical Facts above, particularly Nos. 17 to 20, inclusive, which need not be repeated here, Captain Eminizer was negligent in the performance of his duties, particularly the duty he owed to the Abogado.

■ It is true that a tug is not an insurer, is bound only to exercise reasonable care, and is ordinarily not required to anticipate negligence on the part of those in charge of the tow. The Ellenville, 40 F.2d 47 (4 Cir., 1930). In this case, however, the tug captain was in charge of the undocking, saw that the stern lines were not so placed as to be able to perform their customary functions, and took no steps whatever to learn what other lines were out, how they ran, and whether they were sufficient in number and quality to permit the Holland to make up to the Sands Point in the manner and at the time that it did.[9]

■ Here, as in other maritime situations, knowledge means not only personal cognizance but also the means of knowledge, of which a captain is bound to avail himself, of conditions likely to produce or contribute to a loss unless appropriate means are adopted to prevent it. Avera v. Florida Towing Corporation, 322 F.2d 155, 166 (5 Cir., 1963). The Cleveco, 154 F.2d 605, 613 (6 Cir., 1946). In a number of tow versus tug cases it has been held that a tug in charge of a tow is bound to adapt to

8. The United States argues that a dead ship cannot be held responsible to a third person for the consequences of a collision. However, the fact that a vessel may be a dead ship does not in all circumstances absolve that vessel from fault. The President Madison (Skagit River Navigation & Trading Co. v. S. S. President Madison, American Mail Line Ltd., and Port of Seattle,) 13 F.Supp. 692 (W.D.Wash., N.D., 1935) ; United States v. The Tug Holland, 151 F.Supp. 772 (D. Md., 1957).

9. In this connection it should be recalled that Captain Hinkleman, also an employee of Baker-Whiteley, had noticed the bad condition of the lines.

conditions caused by the negligence of those in charge of the tow, or by the tow's unseaworthiness. Chemical Transporter, Inc. v. M. Turecamo, Inc., 1961 A.M.C. 1520 (2 Cir., 1961); Southwestern Sugar & Molasses Co. v. River Terminals, 153 F.Supp. 923 (E.D.La.1957).

In certain circumstances, see Eastern Tar Products Corp. v. Chesapeake Oil Transport Co., 101 F.2d 30 (4 Cir., 1939), and Southgate v. Eastern Transp. Co., 21 F.2d 47, 1927 A.M.C. 1295 (4 Cir., 1927), a tug may be entitled to assume that the tow will carry a competent and sufficient crew. Baker-Whiteley was not entitled to make that assumption in this case, under the facts found above.

 The Court has given respectful consideration to the opinion of Judge Chesnut in Maryland Drydock Company v. Curtis Bay Towing Company, et al., a summary of which is reported in 1936 A.M.C. 933. That case is superficially similar to this case. The important distinctions are: the vessel in that case had her first officer and some fifteen members of her crew aboard; there was no finding that the towing company had assumed charge of the operation or that the tug captain was to act as docking and undocking master;[10] on the other hand, there was a finding that the tug captain was without knowledge or notice that the lines had been cast off. In the instant case, as we have seen, Captain Eminizer knew that the stern lines were not so placed as to be able to perform their customary function, and that the forward spring line, alone of those he testified he expected to find, would be able to prevent the Sands Point from moving forward against the Abogado or any other vessel moored in front of the Sands Point. As undocking master

Captain Eminizer was under a duty to check the sufficiency of the spring line to sustain the strain he was about to place upon it, or to take other steps, such as directing the Progress to make up first, or waiting until the arrival of the Resolute, which could have provided additional resistance to the forward pressure exerted by the Holland.

Captain Eminizer was an employee of Baker-Whiteley, and that company is responsible to Tebbs, the owner of the Abogado, for Captain Eminizer's negligence. This is not a case like Farrell Lines, Inc. v. Birkenstein, supra, where the pilotage contract made the docking master the servant of the vessel towed rather than of the towing company. See also Publicker Industries v. Tugboat Neptune Co., 171 F.2d 48 (3 Cir., 1948).

 The Court finds that Diakakis was also negligent. On the afternoon of April 17, Diakakis prudently caused the linemen to put out an additional forward spring line and other lines in addition to the one spring line, two bow lines and two stern lines, which had been put out under the orders of Captain Hinkleman.[11] Nevertheless, before the Baker-Whiteley tugs arrived on April 18, Diakakis caused these additional lines (with the exception of one bow line) to be taken up by linemen furnished by American Ship Service, although Diakakis knew or should have known that the remaining forward spring line was a weak line and that the two stern lines could not function to prevent the forward movement of the Sands Point as they ordinarily would. The action of Diakakis in taking up the additional lines was, therefore, negligent.

 The yacht Abogado did not cause or contribute to the happening of the collision.

---

10. The oral opinion of Judge Chesnut, as transcribed, contains the curious statement that "the tugs in the matter were the employees of the Isthmian Steamship Company." Judge Chesnut did not cite any authorities to support his decision.

11. Even a watchman should see that proper lines are out. Dailey v. Carroll, 248 F. 466 (2 Cir., 1917); The President Madison, 13 F.Supp. 692 (W.D.Wash., 1935).

■ Cataneo and his employees were not chargeable with any negligence which caused or contributed to the happening of the collision.

■ American Ship Service is not chargeable with negligence, on the ground that its employees began to single up before the tugs arrived. Whether Diakakis be considered a mate or a watchman, he was in charge of the vessel for the Marshal and in charge of the lines until the docking master (Captain Eminizer) arrived at the scene.

■ No negligence on the part of the Pacific Shipping Corporation, owner of the Sands Point has been shown. The ship had been in the custody of the Marshal for several months.[12]

No negligence on the part of the Marshal, except the negligence of Diakakis, has been shown.

■ The Court finds that the two concurrent proximate causes of the accident were the negligence of Captain Eminizer of the tug Holland and the negligence of Diakakis.[13] As noted above, Baker-Whiteley is responsible for the negligence of Captain Eminizer. The responsibility for the negligence of Diakakis will be considered in the next section of this opinion.

### E. Findings and Conclusions with Respect to Liability for the Negligence of Diakakis

■ The arrest and seizure of the Sands Point under the monition issued by this Court and the delivery of the vessel into the Marshal's custody pursuant thereto created a maritime bailment to the United States, by operation of law. See Seaboard Sand and Gravel Corp. v. Moran Towing Co., 154 F.2d 399 (2 Cir., 1946); Pennsylvania R. Co. v. United States, 245 F.2d 321 (2 Cir., 1957); 28 U.S.C. § 549. The Marshal was acting as an officer of this Court in hiring the watchmen and in making the arrangements for the transfer of the vessel; in effect, he was acting on behalf of all persons having an interest therein.[14]

■ For the purposes of this case, the vessel and the United States as the substitute for the Marshal under the Suits in Admiralty Act,[15] should be considered as a unit, liable for any negligence on the part of Diakakis. In view of the insurance, see note 2, above, any judgment against the vessel or the United States as the substitute for the Marshal, the bailee of the vessel, will be borne by the insurer unless the vessel and the United States are entitled to indemnity from Baker-Whiteley. It is immaterial, therefore, whether the judgment be entered in rem against the ves-

---

12. See, by way of analogy, West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L. Ed.2d 161 (1959).

13. Tebbs and the government argue that Captain Hinkleman also had been negligent in not putting out more lines before he left the vessel on April 17 and in docking the vessel so close to the Abogado. Docking in such proximity was not a departure from the customary practice in the port of Baltimore, but the proximity is a factor to be considered in deciding whether due care was exercised by those in charge of docking and undocking the Sands Point. The Court agrees that Captain Hinkleman was negligent in not seeing that more lines were put out, especially since he had noted the poor quality of the lines. Allied Chemical & Dye Corporation v. Tug Christine Moran, 303

F.2d 197 (2 Cir., 1962), Hebert v. Barge ABL-22, 221 F.Supp. 725 (E.D.La., 1963). Such negligence, however, was not a proximate cause of the accident, because Diakakis recognized the insufficiency of the lines and put out additional lines that evening. American Sugar Refining Co. v. City of New York, 33 F. 2d 97 (2 Cir., 1929).

14. The liability of the Marshal has almost always been discussed in the context of claims by the owner of the property seized against the Marshal. See 2 Benedict on Admiralty, 6th Ed. 1940, § 301; Matoil Service & Transport Co. v. Schneider, 129 F.2d 392 (3 Cir., 1942); Annotation, 138 A.L.R. 711.

15. 42 U.S.C.A. §§ 742, 745 (see earlier opinion in this case, 227 F.Supp. at 658).

sel or in personam against the United States, or both.

Under all the circumstances, the Court concludes that the judgment in favor of Tebbs should be in personam against the United States under 42 U.S.C. § 742, and in personam against Baker-Whiteley.

There remains for consideration the question of liability over.

### F. *Liability Over*

Several cross-claims for indemnity have been filed, (a) by Pacific Shipping as owner of the Sands Point and by the United States against Baker-Whiteley, against Cataneo and against American Ship Service; and (b) by Baker-Whiteley against the proceeds of sale of the vessel and against the United States.

None of these claims for indemnity requires extended discussion except the claims of the Sands Point and the United States against Baker-Whiteley. The Court has found that there was no negligence on the part of Cataneo or American Ship Service which contributed to the accident, and the Court finds that they did not fail to render workmanlike service. They supplied linemen only, without foremen, and were not obligated by their contract to supply foremen. It is also clear that the United States breached no duty which it or the Marshal owed to Baker-Whiteley under the facts as found.

The claim of the Sands Point and of the Government against Baker-Whiteley is based upon the implied warranty of workmanlike performance which Baker-Whiteley assumed when it made its oral contract with the Marshal. Dunbar v. Henry DuBois Sons Co., 275 F.2d 304 (2 Cir., 1960), Gray v. Johansson, 287 F.2d 852 (5 Cir., 1961), James McWilliams Blue Line v. Esso Standard Oil Co., 245 F.2d 84 (2 Cir., 1957). A similar warranty has been the basis for many recent cases brought by vessel owners against stevedoring companies. See, e. g., Crumady v. The J. H. Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959), Weyerhaeuser S. S. Co. v. Nacirema Co., 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). United States Lines Co. v. King, 363 F.2d 659 (4 Cir., 1966), Calmar Steamship Corp. v. Nacirema Operating Co., 266 F.2d 79 (4 Cir., 1958).

The question whether any, and, if so, what, kind of conduct on the part of the vessel may prevent the enforcement of such a claim for breach of warranty has been discussed but not fully resolved in the cases cited. It has been held that the supplying by the vessel of unseaworthy equipment which the stevedore activates does not ordinarily prevent such a claim. United States Lines Co. v. King, supra. Calmar v. Nacirema, supra. It has also been held that negligence on the part of the vessel in supplying such equipment does not generally prevent the enforcement of the implied warranty. Weyerhaeuser v. Nacirema, supra, Calmar v. Nacirema, supra, T. Smith & Son, Inc. v. Skibs A/S Hassel, 362 F.2d 745 (5 Cir., 1966). In *Weyerhaeuser*, the Supreme Court stated that in cases involving contractual indemnity, "an application of the theories of 'active' or 'passive' as well as 'primary' or 'secondary' negligence is inappropriate." 355 U.S. at 569, 78 S.Ct. at 442. "The action over is in contract, and whether the shipowner can recover turns on whether his actions are such as to bar the enforcement of the contract * * *" Calmar v. Nacirema, 266 F.2d at 81. The Second Circuit has repeatedly held: "Whether a hazard is created by the negligence of the shipowner or otherwise, the stevedoring firm is liable for indemnity if a workmanlike performance would have eliminated the risk of injury." DeGioia v. United States Lines Co., 304 F.2d 421, 424 (2 Cir., 1962); Nicroli v. Den Norske Afrika-Og Australielinie, etc., 322 F.2d 651 (2 Cir., 1964). And in Albanese v. N. V. Nederl. Amerik Stoomv. Maats, 346 F.2d 481 (2 Cir., 1965), the Court stated: "Whatever fault of a shipowner may be said to relieve the stevedore of his duty under the warranty, it seems plain that it must at the least prevent or seriously handicap the stevedore in his ability to do a workmanlike

job. Merely concurrent fault is not enough." 346 F.2d at 484.

Applying that principle to the facts of this case, the fault on the part of Diakakis—taking in the second spring line before the tugs arrived—did not prevent or seriously handicap Baker-Whiteley from doing a workmanlike job. If Eminizer had made any effort to learn what lines were out and what the condition of those lines were, he could have taken steps to avoid the accident. Although the Court has found that the accident was caused by the concurrent fault of Diakakis and of Eminizer, the Court concludes that under the authorities cited above, the United States, as the representative of all parties having an interest in the Sands Point or liable for the negligence of Diakakis, is entitled to indemnity from Baker-Whiteley because of that company's breach of its implied contract of workmanlike service.

Counsel should prepare an appropriate order.